Raymond S. Barry and Alice Barry v. Commissioner.
Barry v. Commissioner
Docket No. 94268.
United States Tax Court
T.C. Memo 1963-225; 1963 Tax Ct. Memo LEXIS 119; 22 T.C.M. (CCH) 1129; T.C.M. (RIA) 63225; August 22, 1963
*119 Value of partially improved subdivision lots and option to purchase additional acreage received in liquidation of collapsible corporation determined. Charles A. Kienzle and James P. Jones, 50 W. Gay St., Columbus, Ohio, for the petitioners. Henry T. Nicholas, Jr., and William I. Bubenzer, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1957 in the amount of $201,225.18. The only issue for decision is the fair market value of certain assets received by petitioner Raymond S. Barry on May 29, 1957, upon the complete liquidation of Westwood Homes *120 Development Co. (hereafter called Westwood). This will determine whether the gain realized by petitioners on those assets is taxable as ordinary income under section 341, I.R.C. 1954, or as capital gain. It is stipulated that Westwood was a collapsible corporation and that the assets involved are section 341 assets but the question is whether the gain realized on the section 341 assets is more than 70 percent of the total gain realized, as required by section 341(d)(2). Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife who resided in Upper Arlington, Ohio, in 1957. They filed a joint Federal income tax return for that year with the district director of internal revenue, Columbus, Ohio. Reference hereafter to petitioner shall be to Raymond S. Barry. Petitioner's business is the construction of homes and the sale of real estate. Westwood was a corporation incorporated under the laws of Ohio on February 22, 1955. During its existence, petitioner was the owner of all the issued and outstanding stock of Westwood. The business of the corporation was development of two subdivisions in Upper Arlington, *121 known as Country Homes Addition and Westwood Acres. The property known as Country Homes Addition consisted of two blocks in Upper Arlington and was purchased by Westwood with building lots platted but unimproved. Westwood sold lots in Country Homes Addition only to construction companies owned either by petitioner or by his wife or by both of them. Prefabricated houses were constructed on the Country Homes Addition lots, the prices of which ranged from $18,000 to $24,000. The city of Upper Arlington is a suburb of Columbus, Ohio. It is a city of desirable residential locations and is known generally as a prestige community of good homes. It experienced rapid growth in population and in real estate development after World War II. According to the 1950 census its population was 9,024; in 1960 the population was 28,456. At the end of 1949 there were 2,818 dwelling units of all types in the city of Upper Arlington and by the end of 1959 the number had grown to 8,698. There was some decline in real estate development in Upper Arlington in 1957. The number of single family residential building permits granted by the city of Upper Arlington in the years 1952 through 1961 were as follows: *122 Year
Number
1952
244
1953
198
1954
362
1955
623
1956
423
1957
388
1958
426
1959
367
1960
236
1961
221
On November 30, 1955, Westwood entered into a contract to purchase property from certain individuals, one of whom was Roger Mayne, at a price of $2,725 per acre. The sellers owned 56.5 acres of property within the city limits of Upper Arlington about 2 miles east of Country Homes Addition. Pursuant to the provisions of the contract and of an amendment to it, Westwood purchased 39.4 acres of the property and obtained an option to purchase the remaining 17.1 acres. The option commenced January 1, 1957, and expired about December 23, 1959, and was assignable only to petitioner or a corporation controlled by him. As part of the purchase agreement Westwood gave Mayne an option to purchase 20 lots from the 39.4-acre tract which came to be known as Westwood Acres, and Mayne was also given an option to purchase 10 lots from the 17.1 acres if Westwood exercised its option. Mayne's option ran 1 year from the date that home construction was begun on the property. Petitioner began construction on the first house in Westwood Acres in June 1957. The house was *123 completed in February 1958. Construction of 12 houses was begun in 1957; in that year sales of 7 of the houses were closed, that is, deeds to the properties were transferred. The western boundary of Westwood Acres was irregularly shaped, which made the property difficult to subdivide, and petitioner on behalf of Westwood approached the official of a church which owned property to the west of Westwood Acres and attempted to negotiate an exchange by which triangularly shaped parcels of land would be exchanged by Westwood and by the church, and the eastern boundary of the church's property as well as the western boundary of Westwood Acres would be squared off. The official of the church was willing to make the exchange but only if, at the same time, the church could dispose of 6.9 acres of its property adjacent to Westwood Acres which it would own as a result of the exchange. Petitioner made arrangements personally to purchase the 6.9-acre parcel at a cost of $3,200 per acre. The exchange and purchase were consummated in September 1956. On November 7, 1956, Westwood and petitioner joined in filing for record a plat of Westwood Acres which was comprised of the 39.4 acres purchased *124 by Westwood from Mayne and others in December 1955 and the 6.9-acre tract later purchased by petitioner in September 1956. The plat subdivided the property into 121 lots with several streets running through it, and a narrow strip containing 1.77 acres running across the northern boundary of the property designated "Reserve B." The lots were not all uniform in size and shape but the average lot had a front footage of about 95 feet and a depth of about 130 feet. The plat was approved by the city of Upper Arlington on July 9, 1956, and after approval was obtained, petitioner and Westwood petitioned the city to install certain improvements required for the subdivision and the city acted favorably on the petition. Westwood Acres lay within a triangle formed by Fishinger Road which ran in an east-west direction on the south side of the property, by Tremont Road on the west, and by Kenny Road on the east. One of the improvements included in the petition filed with the city was for a street through Westwood Acres connecting Tremont Road and Fishinger Road. Other improvements were water mains on this street; a trunk sanitary sewer serving lots along the western, southern, and eastern boundaries *125 of the subdivision; a branch of the trunk sewer which would serve lots in one of the proposed inner blocks of the subdivision; and a trunk storm sewer serving lots in the western and central sections of the subdivision. As of May 29, 1957, these improvements were completed and 36 lots in Westwood Acres fronted, entirely or partially, on the new street. The storm sewer ran in front of or between 48 lots, but estimates of the assessments against 28 other lots as of May 29, 1957, would have included charges for a storm sewer because surface water from the 28 lots would drain into the sewer when streets in front of the lots were completed. The sanitary sewer served 72 lots. When the city makes such improvements in a subdivision after the approval of the plat, the letting of bids and the construction is controlled entirely by city officials. The city pays costs during construction with funds borrowed from local financial institutions on interim financing. When improvements are completed they can be paid for in two ways. The owners of benefited lots can pay the costs after they have been established and prorated to lots by an assessment, or the city can issue bonds to cover the costs with *126 the lot owners paying off the bonds over a period of years. The latter method of paying the costs is known as "going to assessment." A subdivider can pay the city the costs of improvements which benefit both his property and that of another person and later collect from the other property owner when the benefit is used. Until collection the subdivider has to finance the entire costs. Instead of having the city construct the improvements, property owners can do the work themselves and post a bond with the city in the amount of estimated costs. To obtain such a bond, a subdivider must maintain on deposit in a local bank funds to cover the estimated costs and he must pay premiums on the bond in the amount of three-fourths of 1 percent of the amount involved in the construction work. However, it is usually advantageous for a builder to have his own construction work done if only his property is to be benefited since he has control over the work and can usually complete it sooner than if he asked the city to have it done, he can save administrative costs which are charged by the city on its work, and he can sometimes save the cost of financing the work. The improvements constructed in *127 Westwood Acres before May 29, 1957, were part of a larger program of construction by the city and it was to the advantage of Westwood and petitioner to have the city do the work. On May 29, 1957, Westwood transferred all of its assets to petitioner in exchange for all its stock and for the assumption by petitioner of all its liabilities, in complete liquidation of Westwood. The assets of Westwood on that date consisted of cash in the amount of $7,375.63, 93 lots and 2 reserves in Westwood Acres, the option to purchase 17.1 acres of land north of Westwood Acres, and all of the stock in Fleetwood Homes, Inc., which stock had a fair market value on May 29, 1957, of $34,193.41. On the date of transfer to petitioner, the liabilities of Westwood consisted of $53,140, representing the amount still owed by the corporation on the purchase price of the 39.4 acres of land bought pursuant to the contract of November 30, 1955, $35,809.50 representing the estimated costs of improvements then in place on the corporation's lots in Westwood Acres, and $3,240 representing unpaid fees for water taps in the Country Homes Addition. On May 22, 1957, Westwood had sold lots Nos. 2-4 and 37-42 in Westwood *128 Acres to Larchmont Homes, Inc., a corporation all the outstanding stock of which was then owned by petitioner, and on May 29, 1957, Larchmont Homes, Inc., owned the foregoing lots in Westwood Acres; petitioner owned lots Nos. 43-55, 87-90, 121, and 122 as shown on the plat of the subdivision; these lots comprised the majority of the lots that were fully improved on May 29, 1957. On that date Westwood owned lots Nos. 5-36, 56-86, and 91-120, only 7 of which lots were fully improved, and Reserves "A" and "B" as shown on the plat. [1] On the date of transfer to petitioner, the adjusted basis for Federal income tax purposes to Westwood of the lots and reserves in Westwood Acres was $138,551.25. The adjusted basis to petitioner of his shares of stock in Westwood was $26,000. In May 1957 there were some 350 to 400 building lots for sale to home builders in the vicinity of Westwood Acres and there were several somewhat comparable subdivisions with available lots nearby. To the south of Westwood Acres was Wakefield Forest Addition; [2] to the east of Westwood Acres was a subdivision known as Cranford Homes; directly *129 north was Turkey Run Subdivision; to the west was Millwood Subdivision; and to the northwest of both Westwood Acres and Turkey Run was Manchester Place Addition Extension No. 2. Wakefield, Millwood, and Manchester were subdivided and developed by the Upper Arlington Co., or companies owned by the same interests, who had long been instrumental in the development and growth of Upper Arlington. There were 84 single residence building lots in Manchester Addition No. 2. Of these, 63 were sold in late 1956 and in 1957, generally at a gross selling price of $50 per front foot for a lot 135-145 feet deep and 96-97 feet wide. The gross selling price included all improvements, which averaged about $18.70 per front foot. Raymond S. Barry, Inc., a corporation in which petitioners were stockholders, purchased the following lots in Manchester Place Addition No. 2: Price per
front
Gross price
foot
Date [1]
$4,500 $50
Nov. 30, 1956
4,700
50
Dec. 12, 1956
4,500
50
Jan. 28, 1957
4,800
50
Feb. 6, 1957
4,800
50
Feb. 26, 1957
4,850
50
Mar. 18, 1957
4,850
50
Apr. 12, 1957
4,850
50
June 18, 1957
*130 Wakefield Forest is south across Fishinger Road from Westwood Acres. On the South boundary of Wakefield Forest is a new senior high school. Lots facing the high school and vacant land on the east were zoned for apartments. There were 274 single family residential lots in Wakefield Forest, covering about 114.5 acres, of which the Upper Arlington Co. owned about 104.1 acres and Mabel B. Kaiser about 9.4 and a third party about 1 acre. After the subdivision was platted, most of the Kaiser property was sold to John H. Pace for $33 per front foot, including about $2.40 for improvements, and Mabel B. Kaiser's interests in 3 lots were sold with the interests of the Upper Arlington Co. Two hundred and thirty-eight lots were sold in 1957 and 1958 by the Upper Arlington Co. at an average price of about $30 [3] per front foot exclusive of all costs of improvements and assessments. The costs of impovements ranged from about $13.50 per front foot to over $34.40 per front foot for a corner lot with a double assessment *131 for streets, but the average cost of all improvements, including sanitary sewers for which the owners of the subdivision paid cash, was about $23.70 per front foot. The Turkey Run Subdivision was northwest of Westwood Acres. To the east of Turkey Run was the Ohio State University golf course, and the lots abutting the course were considered prime property. To the west of Turkey Run the city bought land in February 1957 for a future park and school. It was generally known that the land would be put to this use. There were 49 single family residential lots in Turkey Run and these lots were first put on the market in the fall of 1956 and by the end of 1958 only 31 of them had been sold. Nine of the lots abutted the golf course; 8 of these lots sold for a gross price of about $60 per front foot. These 9 lots were faced by 7 others on the west side which sold for about $31 per front foot. Two of the 31 lots backed and fronted on streets and were therefore subject to double assessments; these lots sold for about $18.20 per front foot. The remaining 14 lots were sold at prices which average about *132 $26 per front foot. Millwood Addition is on the southwest side of the intersection of Fishinger and Tremont Roads and west of Westwood Acres. In 1957 Millwood was bounded on the south and on the west by previously developed subdivisions and on the north and on the east by vacant land. Homes nearby were in the $22,000-$25,000 range. The vacant land on the east had been set aside for a shopping center. Forty lots in Millwood Addition, including all the lots which faced the proposed shopping center, were zoned for apartments. There were 111 single family residential lots in Millwood all of which were sold to three purchasers pursuant to contracts made in 1957 for a price of $30 per front foot exclusive of any improvements. Set forth below is a table showing the prices paid for various tracts of undeveloped land in the city of Upper Arlington during the years 1955 to 1958: Approximate
Approximate
Approximate
number of
date of
price per
acres
Approximate location
purchase
acre
48
Northwest corner of Fishinger and Surrey Hill
Roads (near Manchester)
1955
$5,200
39
Northeast corner of Tremont and Fishinger (West-
wood Acres)
Dec. 1955
2,725
7
Northeast corner of Tremont and Fishinger Roads
(church property which became part of Westwood
Acres)
Sept. 1956
3,200
16
North side of Fishinger Road between Tremont Road
and Mountview Road (west of Westwood Acres)
Nov. 1956
4,150
16
Reed Road between Fishinger Road and McCoy
Road (west of Turkey Run)
Feb. 1957
3,100
26
Northwest corner of Reed and McCoy Roads (north
of Turkey Run)
Mar. 1957
3,000
20
Northeast corner of Reed and McCoy Roads
July 1957
5,000
42
Southwest corner of Tremont and Fishinger Roads
(Millwood)
1957
4,750
16
West side of North Star Road between Ridgeview
Road and Zollinger Road (south of Wakefield)
Oct. 1957
5,000
16
First block west of immediately preceding listing
Apr. 1958
5,600
*133 Certain of the tracts listed above were premium tracts. The tract on the northwest corner of Fishinger and Surrey Hill Roads contained a large number of beautiful trees and a little ravine. Parts of it ultimately became one of the finest residential areas in the city of Upper Arlington. The tract on the north side of Fishinger Road between Tremont Road and Mountview Road abutted on the Ohio State University golf course. The tract on the southwest corner of Tremont and Fishinger Roads was zoned in part for apartments, and apartment lots bring higher prices than single family lots. The tract listed above as being located on the northeast of Reed and McCoy Roads was purchased by a church for its own use rather than by a developer for subdivision purposes. Ultimate Findings The fair market value on May 29, 1957, of the 93 lots in Westwood Acres distributed to petitioner by Westwood in liquidation was $252,361.50, representing a value of $24 per front foot for 9,023 front feet ($216,552), plus $35,809.50, the cost of the improvements which had been made to that date. The fair market value on May 29, 1957, of the option to purchase an additional 17.1 acres lying north of Westwood *134 Acres for $2,725 per acre, was $14,350, representing the difference between the option price and the fair market value of the land per acre on that date, which we find to have been $3,600 per acre, less approximately $612.50 of anticipated assessments. The fair market value on May 29, 1957, of Reserve B, as agreed to by the parties, was $5,664. Reserve A had no value. The parties have stipulated that the 93 lots, the option and the reserves, referred to above, were section 341 assets, and that Westwood had no other section 341 assets, and we so find. Opinion Petitioners maintain herein that the 93 lots transferred to petitioner in liquidation of Westwood on May 29, 1957, had a fair market value equal to the so-called retail value of the lots less a discount of 20 percent. Respondent contends that the lots had a fair market value at the critical date of not less than $36 per front foot. The fair market value of the lots and of the other assets transferred to petitioner in the course of liquidation is pre-eminently one of fact and our conclusion on the ultimate facts should dispose of the issues. Petitioners' contentions are based primarily upon an appraisal made shortly before *135 the transfer in liquidation. The appraisers' value of the lots was arrived at by ascertaining the price at which the lots would sell with improvements; that is, after streets, water mains, storm sewers, and sanitary sewers had been constructed to serve each lot. Seven of the lots distributed in liquidation were completely improved, others were improved to some extent, and other were benefited by existing improvements to the points where an estimate could be made of the assessments against them for various facilities. These factors were taken into account by the appraisers. It was concluded that a lot fully improved to the point where a house could be built upon it and when it was served by all necessary facilities would be $50 per front foot. A lot completely unimproved would sell for $30 per front foot. The selling price of the lot with one or two but not all the improvements would range somewhere between the figure of $30 per front foot and $50 per front foot. The appraisers then discounted the selling price per lot by 20 percent. This discount figure was to take into account the expenses and risks a purchaser of the lots in May 1957 would incur in holding and improving them until *136 he could sell them, plus a reasonable profit. It was estimated that 1 to 2 years would be involved in holding the lots before they could be completely improved and sold. The total value placed on the 93 lots, including the improvements made to date, was $243,493.60. Upon consideration of all the evidence we are convinced that on the average the lots have sold for $50 per front foot, improved, and that the average cost of the improvements was $20 per front foot, thus giving an average front foot selling price of $30 per front foot, unimproved or with the cost of improvements assumed by the purchaser. In our opinion the two appraisers who appraised each of these lots individually immediately prior to the critical date were well qualified and the testimony of other witnesses in the real estate development business supports the method used by the appraisers in arriving at appraised values. Furthermore, evidence of sales of comparable lots in comparable subdivisions at about the same time indicates a selling price of $30 per front foot for unimproved lots and $50 per front foot for improved lots. There is some evidence indicating that one nearby subdivision or another might be more or *137 less desirable and valuable that Westwood Acres, and that sales of individual lots were made for more or less than the $30 and $50 per front foot figures. But certainly the preponderance of the evidence supports those two figures, and we have found them to be our best judgment of the average retail selling prices of the 93 lots here involved. In fact respondent does not seriously contest the $50 selling price for improved lots - but he does argue that the lots could have been sold for an average of $36 per front foot, unimproved. We find nothing in the record to justify respondent's figure except evidence of an occasional sale of a particular or a few particular lots in other subdivisions, which we cannot say are necessarily representative of the average. As heretofore noted, after arriving at the retail selling price of the individual lots in the state of improvement they were in in May 1957, petitioner's appraisers then discounted this price 20 percent to arrive at their appraised values for each lot. The discount was to cover the risk and the additional expenses involved in developing this subdivision to completion and selling all the lots, plus a reasonable profit to the developer. *138 Respondent did not discount his retail sales price in arriving at his total value, apparently on the theory that the lots distributed to petitioner could be sold on an individual basis at the full retail price. We do not agree. The evidence indicates that the lots could be most advantageously sold to a developer who would complete all the improvements. Such a developer would insist on a discount from the price he could expect to receive on resale of the lots to cover his risks, his expenses such as sales commissions, legal fees, interest, and maintenance, and to allow himself a reasonable profit. This is borne out by the markup over cost realized by other developers who developed and sold other comparable subdivisions in the area. We think it is correct to use a discount if the retail selling price of the lots is to be used as a starting point for valuing the 93 lots. We had some doubt that the discount figure used by the appraisers was justified under the circumstances here involved - thinking that it might be too high. This subdivision was partially developed in May of 1957, and a few of the lots were fully improved and ready for sale to a retail buyer. However, the testimony of *139 the real estate men offered by petitioner was to the effect that these circumstances had been taken into consideration in arriving at a 20 percent discount figure. This testimony indicated that the usual discount would be from 25 percent to 30 percent, and one of petitioner's appraisers testified that they had taken the stage of development of the subdivision into account in arriving at the 20 percent figure. We find no specific evidence to rebut this figure and do not feel justified in substituting our judgment for that of the experts without convincing evidence to support it. Furthermore, as heretofore noted, the evidence of profits realized by other developers on the sale of lots in somewhat comparable subdivisions indicates a profit of at least 25 percent, and in some instances over 100 percent, over the cost of the land. We recognize that the length of time the property was held would have considerable bearing on the amount of profit a developer might expect on the sale of lots in a subdivision, and that we do not know just how long the Upper Arlington Co. owned or controlled the raw land upon which the other subdivisions were developed. However, the evidence presented supports *140 the appraiser's view that any developer or builder buying the assets and liabilities of Westwood in the stage of development of this subdivision on May 29, 1957, would have discounted the retail price of the lots by 20 percent in arriving at the price he would pay for the assets; and we have adopted that figure in arriving at the value we have found for the 93 lots. We do feel constrained to depart from the appraisers' use of the discount with respect to the cost of the improvements already in place on May 29, 1957. While we recognize that a builder-developer such as petitioner might run into some delay in selling the lots if houses were first put on them, it would appear that the major part of the cost of improvements already in place was attributable to the 7 or 8 lots that were fully improved on May 29, 1957, and that a developer could probably have disposed of these lots with very little delay. When taken into consideration with the other variables we have mentioned, we have concluded that the discount should not be applied to arrive at the value of the improvements already in place. In arriving at the value on May 29, 1957, of the 93 lots we have therefore used a value of *141 $24 per front foot ( $30 per front foot discounted by 20 percent) for 9,023 front feet, plus $35,809.50, the cost of the improvements in place at that date, or a total value of $252,361.50. With respect to the value of the option to purchase an additional 17.1 acres of raw land immediately north of Westwood Acres for $2,725 per acre, petitioner contends that the value should be computed by multiplying the difference in the option price per acre and the fair market value of the land per acre on the date of distribution by the 17.1 acres covered by the option, and then discounting the result to some extent because of the fact that the option was not freely assignable. Petitioner argues that the fair market value of the land on the date of distribution was $3,200 per acre and that the value of the option was about $5,000. By amended answer filed after conclusion of the trial respondent alleged that the option was worth $38,861.55 rather than the $5,000 figure set forth in Exhibit A to the notice of deficiency, which revised value appears to be based on the premise that the land was worth $5,000 per acre on the date of distribution and the difference between the option price per acre *142 and $5,000 per acre, multiplied by the number of acres, produces the above value of the option. [4]
We have concluded that the value of the land subject to the option was $3,600 per acre on May 29, 1957, and that the value of the option was the difference between the option price per acre and the value of the land per acre, multiplied by the number of acres covered by the option, less a small amount for anticipated assessments against the optioned property for improvements already made from which it would benefit. In arriving at this conclusion we have attempted to adjust prices involved in comparable sales as set forth in our findings for those factors which distinguished this particular acreage from other areas. The evidence indicates that the value of raw land in Upper Arlington suitable for subdividing was increasing from the date the option was granted until May of 1957, and that somewhat comparable tracts were being sold at more than $3,600 per acre near the same time. However we also recognize that the property covered by the option was further removed from the downtown areas, from schools and shopping *143 centers, and was not as close to available water supplies and sewers as were some of the other properties. These and other factors, including the fact that the option was not freely assignable, would tend to decrease the value of the option. The above represents our best estimate of the value of the option, which, despite all the evidence adduced, must necessarily be only an estimate. As we understand it there is no dispute as to the value of the two reserves, and we have accordingly found Reserve A to have no value and Reserve B to have a value of $5,664 as determined by petitioner's appraisers - and reported on petitioners' return. The parties shall make the necessary computations to determine the amount of petitioners' gain and the percentage of that gain attributable to the section 341 assets under Rule 50, based on the conclusions as to values we have made above. The results of these computations will determine whether petitioners' gain is taxable as ordinary income or capital gain. Decision will be entered under Rule 50. Footnotes
1. There was no lot No. 1. Reserve A was a small area which had no value.↩
2. Sometimes referred to in the record also as Wakefield Forest.↩
1. Date when contract for purchase entered into and when building on the lots could begin, although money may have been put in "escrow" to secure "option" before this time.↩
3. This amount does not include several sales which were obviously bargain purchases.↩
4. Respondent uses 17.082 as the number of acres in this computation.↩